Slip-Op. 01-95

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: CHIEF JUDGE GREGORY W. CARMAN

_____
                                                :
BETHLEHEM STEEL CORPORATION, et al.,            :
                                                :
                    Plaintiffs,                 :
                                                :
        v.                                      :
                                                :
UNITED STATES,                                  :          Court No. 00-03-00116
                                                :
                    Defendants,                 :
                                                :
        &                                       :
                                                :
POHANG IRON & STEEL CO.,                        :
                                                :
                    Defendant-Intervenor.       :
_____:

[Commerce's Remand Determination is sustained in part and remanded in part].


    *Dewey Ballantine* (John A. Ragosta, Navin Joneja), Washington, D.C., for Plaintiffs.


    *Stuart E. Schiffer*, Acting Assistant Attorney General; *David M. Cohen*, Director; *A. David Lafer*, Senior Trail Counsel; *William Olsen*, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Michael D. Lynch*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, D.C., for Defendant.


                                  Dated:  August 8, 2001.

**OPINION**

**CARMAN, Chief Judge:** This action challenges the United States Department of Commerce's (Commerce) *Remand Determination Pursuant to Bethlehem Steel Corp. v. United States* (*Remand Determination*) issued on May 25, 2001. Familiarity with the underlying facts and issues in this case as set forth in the prior opinion is presumed. For the reasons stated below, Commerce's *Remand Determination* is sustained in part and remanded in part.

**BACKGROUND**

On April 4, 2001, this Court remanded to Commerce four issues stemming from its *Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 64 Fed. Reg. 7,316 (December 29, 1999). *See Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d. 1354 (Ct. Int'l Trade 2001) (*Bethlehem Steel I*). Commerce was instructed to: (1) properly address and set forth its reasoning for determining that the infrastructure subsidies received by the Pohang Iron & Steel Co. (POSCO) at Asan Bay were non-countervailable; (2) properly address and set forth its reasoning for determining that the waiver or reduction of import duties on steel making equipment imported by the Korean steel industry were non-countervailable; (3) investigate the potential countervailability of the Korean government's waiver or reduction of import duties on slab; and (4) determine whether the rebate of money to the Dongkuk Steel Mill Company in connection with its purchase of land at Asan Bay constituted a countervailable subsidy. *Id*. at 1370.

On May 25, 2001, Commerce filed its *Remand Determination.* Commerce affirmed its decision not to countervail either the alleged infrastructure subsidies received by the POSCO at Asan Bay or the waiver or reduction of import duties on steel making equipment imported by the

Korean steel industry. Additionally, the agency reiterated its position that the Korean government's waiver or reduction of import duties on slab was non-countervailable because the import duties were eligible for duty drawback. Finally, Commerce reversed its position and concluded that the rebate of money paid in the purchase of land at Asan Bay to Donkuk Steel Mill was a countervailable subsidy.

On June 13, 2001, Plaintiffs filed response papers with the Court challenging: (1) Commerce's failure to fully and adequately explain why it did not countervail the infrastructure subsidy benefits received by POSCO at Asan Bay; (2) Commerce's explanation for refusing to investigate the waiver or reduction of import duties on steel-making equipment; and (3) Commerce's refusal to investigate the reduction of import duties on slab.

### DISCUSSION

On remand, Commerce was tasked with investigating, explaining and/or determining four discrete issues. As in the underlying proceeding, when Commerce's remand determinations or explanations are challenged, the Court is bound to apply the "substantial evidence" and "otherwise not in accordance with law" standard. 19 U.S.C. § 1516a(b)(1)(B)(i) (1995). *See Laclede Steel Co. v. United States*, 125 F. Supp. 2d 525, 530 (Ct. Int'l Trade 2000) (noting that the Court applies the same standard of review to remand determinations as to the original proceedings). Accordingly, the Court will not disturb Commerce's factual determinations where they are supported by substantial evidence, or its legal conclusions where they are a reasonable interpretation of the agency's statutory mandate.

For the reasons stated below, the Court finds Commerce's explanation for refusing to investigate the waiver or reduction of import duties on steel-making equipment to be supported

by substantial evidence.  The Court, however, cannot sustain Commerce's explanation of why the infrastructure provided by the Korean government at Asan Bay was non-countervailable. Commerce failed to address the issues specified by the Court in the remand order and ignored the crux of Plaintiffs' allegations.  Additionally, the Court cannot accept Commerce's continued refusal to investigate the reduction of import duties on slab.  On remand, the agency ignored the Court's directive and did little more than restate its original position that it would not investigate the alleged subsidy.

1.    <u>Commerce's explanation for refusing to investigate the waiver or reduction of import duties on steel-making equipment is supported by substantial evidence and otherwise in accordance with law.</u>

In its *Remand Determination* Commerce explains that it did not receive notice of the Korean government's waiver or reduction of import duties on steel making equipment until October 14, 1999 – almost three months after the preliminary determination and immediately prior to verification.  Due to the lateness, Commerce determined that it did not have sufficient time to conduct an investigation into this alleged countervailable subsidy.

The Court finds Commerce's determination to be supported by substantial evidence and in accordance with law.  Commerce's regulations establish guidelines governing the investigation of new subsidy allegations.  Specifically, 19 C.F.R. §351.301(d)(4)(i)(A) states that new subsidy allegations should be made at least forty days prior to the preliminary determination to ensure that the agency has sufficient time to investigate the allegation.  Additionally, 19 C.F.R. §351.311 places an independent obligation on Commerce to investigate newly discovered practices that reasonably appear to be countervailable if sufficient time remains before the scheduled date of the final determination.  Here, the subsidy allegation was not made until after

the preliminary determination was issued, clearly violating 19 C.F.R. §351.401(d)(4)(i)(A).  As Commerce reasonably points out, the lateness of this allegation constrained its ability to issue questionnaires to the relevant respondents, analyze their responses, submit supplemental questionnaires, and reschedule and complete verification prior to the scheduled date for the final determination.  This Court has consistently held that Commerce must investigate only those "allegations that reasonably appear to be countervailable and are discovered within *a reasonable time prior to the completion of the investigation*."  *See Bethlehem Steel I*, 140 F. Supp. 2d at 1361, quoting, *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1151 (Ct. Int'l Trade 2000) (emphasis added).  The record reveals that this subsidy allegation was not discovered within a reasonable time prior to the completion of the investigation.  Thus, although the independent obligation to investigate created by 19 C.F.R. §351.311 was triggered because the alleged subsidy program appeared to be countervailable, Commerce appropriately exercised its discretion not to investigate this issue.

Where Commerce discovers a potentially countervailable practice too late to include in its investigation, 19 C.F.C. §351.311(c)(2) provides that "Commerce may defer consideration of the newly discovered practice until a subsequent review."  However, because Commerce was aware of the alleged subsidy program, the agency decided not to wait until a subsequent review and requested information on this program from the Korean government in connection with another countervailing duty investigation, *Structural Steel Beams from the Republic of Korea*.  Ultimately, Commerce determined the program was non-countervailable.  *See Final Affirmative Countervailing Duty Determination: Structural Steel Beams from the Republic of Korea*, 65 Fed. Reg. 41,051 (July 3, 2000).  Based on the *Structural Steel Beams* finding, Commerce elected not to investigate this allegation on remand.

The merits of the *Structural Steel Beam* determination are not within the scope of the present case and the Court expresses no view on the issue. Commerce's *Structural Beam* determination, however, bears directly on this proceeding because the Court has consistently held that the agency "has discretion in deciding whether to reinvestigate a program previously found not countervailable in a final agency determination." *Bethlehem Steel I*, 140 F. Supp. 2d, at 1363, *quoting*, *PPG Industries, Inc. v. United States*, 787 F. Supp. 215, 220 (Ct. Int'l trade 1992). The decision to reinvestigate turns on whether the subsequent allegation contains evidence of changed circumstances or provides a sufficient basis of belief that specific producers receive a disproportionate share of the program's benefits. *See id. See also Delverde Srl. v. United States*, 989 F. Supp. 218, 222 (Ct. Int'l Trade 1997), *vacated on different grounds*, 203 F.3d 1360 (Fed. Cir. 2000). Nothing in the record is sufficient to overturn Commerce's determination that Plaintiffs presented no evidence of changed circumstances or the receipt of a disproportionate share of the program's benefits by the Korean steel industry. Accordingly, the Court finds Commerce's decision to be supported by substantial evidence and otherwise in accordance with law.

   2.     Commerce's failure to address whether the infrastructure provided by the Korean government at Asan Bay constitutes a countervailable subsidy is contrary to law.

The antidumping and countervailing duty laws are not punitive in nature, but rather are intended to remedy disparities in the value of imported and domestic merchandise created by impermissible international trade practices. One of the procedural mechanisms designed to protect against the arbitrary and punitive application of these laws is the requirement that the administering agencies – Commerce and the International Trade Commission – fully disclose and explain the reasoning underlying their decisions in a particular case. *See* 19 U.S.C. §

1677f(i)(3)(A) (1994).  In *Bethlehem Steel I*, the United States acknowledged Commerce's

failure to meet this requirement with respect to the alleged infrastructure subsidies provided by

the Korean government to POSCO at Asan Bay:

> Petitioners allege that the [Government of Korea] may be providing infrastructure
> benefits, such as roads, industrial water facilities, distribution depots and electric power
> stations, to the Korean steel industry at the Asan Bay Industrial site, a [Government of
> Korea] constructed industrial site.  Commerce did not explain its position on this alleged
> subsidy in the Final Determination.

The Court agreed that Commerce did not properly address this issue and remanded it to the

agency for further explanation.  *See Bethlehem Steel I*, 140 F. Supp. 2d. at 1364.

On remand, Commerce again failed to discuss the provision of direct infrastructure

benefits – i.e., "roads, industrial water facilities, distribution depots and electric power stations"

– and, instead, focused on whether POSCO's lease terms for its facilities at Asan Bay constituted

a countervailable subsidy.  In so doing, Commerce essentially reiterated the position it took in

the *Final Determination*.  Although also stating that "POSCO did not receive any other

countervailable benefits from the Government of Korea's (GOK) expenditures on infrastructure

at Asan Bay," Commerce's reasoning focuses on the leasing arrangement as opposed to the

provision of direct infrastructure:

> As verified by the Department, POSCO has not purchased any land at the Asan Bay
> industrial site.  The company only has a leasing arrangement…. In order to determine
> whether POSCO received a benefit on this lease, during verification we reviewed the
> GOK's published fee schedule and noted that the fees charged to POSCO on this lease
> were the fees published in the GOK's fee schedule…. Thus, POSCO did not receive any
> discounts from the published fee schedule.

*Remand Determination*, at 3.  Additionally, Commerce restated its discussion of the Harbor Act

and again concluded that this law did not provide a countervailable benefit.[1]  Thus, Commerce

---

[1] Under the Harbor Act, private parties are precluded from owning certain types of infrastructure – i.e., port
facilities.  Therefore, ownership of any improvements to the leased port facilities built by POSCO (or any tenant)

concluded that "based on the evidence on the record and *absent adequate time to solicit and verify additional information*, we conclude that POSCO did not benefit from the GOK's expenditures on infrastructure at Asan Bay." *Remand Determination*, at 4 (emphasis added).

The Court is troubled by Commerce's failure to address the underlying question of whether the Korean government's alleged provision of infrastructure benefits – i.e., "roads, industrial water facilities, distribution depots and electric power stations" – constitutes a countervailable subsidy. The mere fact that POSCO leased its Asan Bay facilities from the Korean government at market rates is not dispositive of whether POSCO received some other form of countervailable subsidy. This revelation is not novel and should not come as a surprise to Commerce because, in fact, the agency has reached the same conclusion in prior investigations. In *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products From Korea*, 58 Fed. Reg. 37,338, 37,348 (July 9, 1993), Commerce stated that:

> The provision of infrastructure at Kwangyang Bay and the exemption from payment of dockyard fees are two separate programs. Even if we viewed the non- payment of dockyard fees as repayment by the government for POSCO's assumption of the costs of constructing the berths, we would still find the exemption to be countervailable. If the government had paid for the costs of construction of berths dedicated solely or principally to POSCO's use, we would have found such government expenditures to constitute a countervailable infrastructure subsidy to POSCO, just as we are finding the three berths actually built by the GOK to be part of the overall infrastructure benefit to POSCO.

With the adoption of the Uruguay Round Agreements Act (URAA), the countervailability of infrastructure turns on whether the infrastructure in question provides a "financial contribution" to specific companies or industries.[2] Consistent with the intent of the URAA, the

_____

reverts to the Korean government. POSCO is compensated for this taking through free usage of port facilities until the fair market value of the improvements is recouped.

[2] The Court notes that with the adoption of the URAA, Commerce abandoned the three-pronged "infrastructure subsidy test" to determine whether government-provided infrastructure is countervailable.

countervailing duty laws state that "the term 'financial contribution' means… providing goods or services, other than *general infrastructure*." *See* 19 U.S.C. §1677(5)(D)(iii) (emphasis added). In adopting regulations implementing the amended countervailing duty laws, Commerce recognized that "the countervailability of infrastructure depends upon the definition of 'general infrastructure.'" *Preamble to Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,378 (November 25, 1998).  To define this broad term, Commerce stated:

> Any infrastructure that satisfies this public welfare concept is general infrastructure and therefore, by definition, is not countervailable and not subject to any specificity analysis. Any infrastructure that does not satisfy this public welfare concept is not general infrastructure and is potentially countervailable. The provision of industrial parks and ports, special purpose roads, and railroad spur lines, to name some examples (some of which we have encountered in our cases), that do not benefit society as a whole, does not constitute general infrastructure and will be found countervailable if the infrastructure is provided to a specific enterprise or industry and confers a benefit.

*Id.* at 65,378.

Plaintiffs allege that the infrastructure provided at Asan Bay does not serve the public welfare, but merely provides a benefit to the industries utilizing the bay's port facilities.  Nothing in the *Remand Determination* addresses these allegations.  The Court does not question Commerce's determination that neither POSCO's lease terms nor the waiver of port fees constitute a countervailable subsidy.  The Court does question, however, Commerce's failure to address the other infrastructure elements alleged by Plaintiffs – i.e., "roads, industrial water facilities, distribution depots and electric power stations" – and requires the agency to meet its obligation to investigate subsidy allegations that reasonably appear to be countervailable. Therefore, the Court again remands this issue to Commerce for further explanation as to whether the direct provision of infrastructure at Asan Bay constitutes a countervailable subsidy.  The Court directs that unlike the prior remand, the agency shall solicit and verify any additional

information that may be needed during this investigation to make a fully informed and explicated

determination.

3.     Commerce's refusal to investigate the reduction of import duties on slab is unsupported by substantial evidence and otherwise not in accordance with law.

In *Bethlehem Steel I*, the Court instructed Commerce to investigate whether the Korean

government's reduction or waiver of import duties on steel slab constituted a countervailable

subsidy.  The Court was concerned that Commerce inappropriately based its decision not to

countervail this program on the expectation that respondents would obtain duty drawback,

thereby negating any benefit conferred by the reduced duties.  The Court was further concerned

that specific companies or industries could receive the use of money that would otherwise be due

as import duties and that Commerce would not investigate whether such use constituted a

countervailable subsidy. [3]

On remand, Commerce did not investigate as ordered but, rather, attempted to explain

and clarify its position.  Commerce reiterated that its obligation to investigate an alleged subsidy

is triggered only where that subsidy appears to be countervailable and that it will countervail

duty drawback programs only where such programs run counter to the provisions of 19 C.F.R. §

351.519.  *Remand Determination*, at 8.  The agency went on to state that "import duties on inputs

that are consumed in the production of an exported product, which are not collected at the point

of importation or which are drawn back at the point of exportation, do not provide a

---

[3] Assume Government X ordinarily charges an across-the-board import duty of eight percent.  If that import duty is reduced to one percent for a particular industry, that industry would appear to receive a benefit in the amount of money it does not have to pay on import duties.  The fact that all companies are hypothetically entitled to receive their import duties back through duty drawback does not arguably negate the benefit conferred from the date the import duties are paid (or not paid) until the eventual date of export and duty drawback.

countervailable benefit" under this regulation. *Id*. at 8-9. Thus, Commerce asserts that, under the regulations, the import duty reduction program was non-countervailable. *See id.*

The Court is troubled by the fact that Commerce ignored its express order to investigate the alleged subsidy program and simply restated its position that the alleged subsidy program did not appear to be countervailable because of the availability of duty drawback. The United States' brief largely reiterates Commerce's position and contends that the agency's decision not to investigate the alleged subsidy is reasonable. In addition, the United States argues that, regardless of whether the reduction of import duties constituted a countervailable subsidy, Commerce was not obligated to investigate Plaintiffs' allegation because POSCO did not import any slab for use in the production of subject merchandise during the period of investigation and, therefore, did not receive any benefit. To support its argument, the United States points to two sentences contained in a footnote[4] in the *Remand Determination* that state "…POSCO confirmed that due to a shortage during the first quarter of 1998, it imported some slab. However, the imported slab was used for the production of hot-rolled coil." The Court is not persuaded by the United States' argument.

The reasonableness of Commerce's decision rests upon the extent to which the program at issue appears to be countervailable. Countervailability is judged against the standards set forth in 19 U.S.C. §1677(5) and 19 C.F.R. Part 351. The subsidy program at issue is not an export subsidy – i.e., the Korean government did not condition entitlement to the reduced import duties on the eventual exportation of a finished product. Similarly, the program is not an import substitution subsidy because the reduction of import duties is not dependent upon the use of domestic goods over imported goods. The record indicates that the standard Korean import duty

on steel slab is 8 percent. Under the program at issue, the Korean government monitors the domestic supply of slab. When either the domestic supply drops below a certain threshold or the domestic industry so requests, the Korean government reduces the tariff rate on steel slab.[5] This reduced tariff rate is available to the entire steel industry, irrespective of the manner in which the individual companies ultimately use the slab, thereby potentially rendering it a domestic subsidy. Where, as here, the benefit associated with a potential domestic subsidy is not tied to a particular product or market, Commerce will allocate the benefit to all products produced by a company, including products that are exported. *See* 19 C.F.R. § 351.525(b)(3). Thus, the fact that POSCO did not use any of the steel slab imported during the period of review in the production of subject merchandise is irrelevant to whether this subsidy (if ultimately found to be countervailable) could be attributed to the company. Rather, as with all forms of "financial contribution," the countervailability of the Korean government's import duty reduction program depends upon whether such program conferred a specific benefit to a particular company or industry. *See* 19 U.S.C. § 1677(5) & (5A).

Commerce has consistently maintained that no benefit was conferred to POSCO because the foregone import duties would have been returned to the company through duty drawback. The mere availability of drawback, though, does not resolve the issue of whether the import duty reduction program is countervailable. Commerce's duty drawback regulation provides:

> In the case of an *exemption of import charges upon export*, a benefit exists to the extent that the exemption extends to inputs that are not consumed in the production of the exported product, making normal allowances for waste, or if the exemption covers charges other than import charges that are imposed on the input.

---

[4] The United States' brief cites to page 10, footnote 4 of the remand determination. The Court assumes the United States was actually referring to footnote number 4 on page 11 of the remand determination and that government counsel simply misstated the page number.

[5] Records indicate that during the first half of the period of review, the standard 8% tariff rate was reduced to 1 percent. During the second half of the review period, the tariff rate was set at 3 percent.

19 C.F.R. §351.519(a)(ii) (Emphasis added). The regulation appears to require a relationship between a party's eligibility for exempted import charges and the exportation of the imported goods. The Court has already noted that, in the present case, the exemption of import duties was not contingent upon exportation, but was available regardless of the manner in which the slab was ultimately consumed. The import duty reduction program, therefore, appears to be missing the crucial link between the exemption of import duties – i.e., exempting 7% of the 8% normally collected – and exportation. [6] Moreover, even if availability of the import duty reduction program is linked to exportation in the present case, nothing in the record demonstrates that the entirety of steel slab imported by POSCO during the period of review was physically incorporated into exported merchandise. Thus, to the extent that POSCO benefited from the use of money otherwise due as import duties on steel slab that was not consumed and exported, 19 C.F.R. §351.519(a)(ii) arguably renders it countervailable.

In the absence of the shelter provided by duty drawback, the import duty reduction program appears to mirror other programs in which a government foregoes otherwise legitimate tax revenues. Section 351.510(a)(1) of Commerce's regulations recognizes that such programs can convey a countervailable benefit:

> In the case of a program, *other than an export program*, the full or partial exemption of an indirect tax or import charge [constitutes a benefit] to the extent that the taxes or import charges paid by a firm as a result of the program are less than the taxes the firm would have paid in the absence of the program. (Emphasis added).

This regulation provides that when a government foregoes otherwise lawful taxes or import charges it is providing a countervailable benefit. The only exception contained in the regulation

---

[6] The Court stresses that at this point the program only *appears* to be missing the necessary link. The issue of whether the program is actually countervailable is not before the Court and because Commerce has not adequately investigated this issue, the record provides no evidence upon which the Court can make a final determination on this issue.

applies to export programs – i.e., programs that establish exportation of a finished product as a prerequisite to receiving an exemption of indirect taxes or import charges. Again, nothing in the record indicates that this prerequisite is satisfied in the present case and, therefore, the import duty reduction program does not appear to be an export program within the meaning of the regulation. Rather, as in cases in which a foreign government foregoes direct or indirect taxes, forgives a company's debt, or provides a below-market interest rates due on a government-funded loan, importers of slab are benefited by being allowed to retain money that under normal circumstances would be unavailable. In such cases, Commerce normally calculates the amount of benefit as the difference between market value or full tax rate and the reduced rate. *See* 19 C.F.R. §§ 351.503, 351.505, 351.506, 351.508, 351.509, 351.510. Although not drawing any conclusions as to whether the import duty reduction program at issue in the present case is ultimately countervailable, the Court believes it useful to analogize it to the countervailable subsidies listed above. Accordingly, the Court again remands this issue to Commerce for further investigation and explanation.

## CONCLUSION

For the above stated reasons the Court finds that: (1) Commerce failed to adequately investigate, address, and explain whether the Korean government's provision of infrastructure benefits at Asan Bay constitutes a countervailable subsidy; (2) Commerce failed to adequately investigate, address, and explain whether the reduction of import duties on slab is countervailable; and (3) in all other respects, Commerce's *Remand Determination* is supported by substantial evidence and otherwise in accordance with law. Accordingly, the infrastructure and slab issues are again remanded to Commerce for further investigation so that the agency can

fully explain the basis for its conclusion.  Pursuant to the attached order, Commerce shall

complete its remand investigation and file its determination with the Court no later than sixty

(60) days from the date this opinion is issued.  As to the remaining issues, the *Remand*

*Determination* is sustained.

$$\overline{\hspace{4cm}}$$

Gregory W. Carman,
Chief Judge

Date:   August 8, 2001
         New York, NY

**ERRATUM**

<u>Bethlehem Steel Corp., et al. v. United States</u>, Court No. 00-03-00116, Slip-Op. 01-95, dated August 8, 2001.

On Page 1, below the caption, on the third line, the words *"Michael D. Lynch*, Office of the Chief Counsel for Import Administration" should read *"Michele D. Lynch,* Office of the Chief Counsel for Import Administration."

August 14, 2001.